# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **OFFICER JASON DEL TURCO,** | Civ. No. 18-15086 (KM) (MAH) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **RANDOLPH TOWNSHIP POLICE DEPARTMENT, DAVID STOKOE, individually and in his capacity as the Chief of Police Of Randolph Township Police Department, TOWNSHIP OF RANDOLPH, MORRIS COUNTY PROSECUTOR'S OFFICE, BRADFORD SEABURY AND JOHN MCNAMARA, JR., both individually and in their capacities as current and/or former employees of Morris County Prosecutor's Office** | |
| **Defendants.** | |

### KEVIN MCNULTY, U.S.D.J.:

Before the Court are motions to dismiss the Second Amended Complaint ("2AC", DE 49) brought by defendants the Randolph Township Police Department, Chief of Police David Stokoe, and the Township of Randolph (collectively, the "Randolph Defendants") (DE 50), and by defendants Morris County Prosecutor's Office, Bradford Seabury, and John McNamara, Jr. (collectively, the "Morris County Defendants") (DE 56).

The plaintiff admits that, when he was a Randolph Township police officer, he lied in testimony before the grand jury and again in court at a suppression hearing. He avoids specifying the precise falsehoods, but asserts

1

the legal conclusion that his testimony, though false, did not constitute a *Brady* violation.[1]

Represented by counsel, he negotiated a deal with the County Prosecutor, who agreed not to press criminal charges in return for his immediate resignation. The County Prosecutor circulated two letters, the so-called "*Brady* Orders," which revealed the false testimony in jurisdictions or cases where Del Turco was involved. The plaintiff portrays himself as a scapegoat, claiming variously that he only perjured himself because he believed that was what the prosecutor wanted him to do, or that the prosecutor's circulation of the information that he had testified falsely amounted to dismissal, or the imposition of "discipline" without the requisite civil service protections. He suggests that *Brady* disclosures of his admitted perjury constitute a reputational harm entitling him to damages, and that the *Brady* Orders must be withdrawn.

The duty to tell the truth under oath is absolute and nondelegable. For a police officer to violate it in a criminal case, even if he thinks the prosecutor wanted him to do so, invites sanctions far more severe than dismissal. Nor can the prosecution suppress such information out of "fairness" to the officer. The prosecution's obligation to disclose that a police witness has testified falsely is a constitutional command under *Brady* and *Giglio*. Indeed, for the prosecution

---

[1]    As used herein, "*Brady*" or "*Brady/Giglio*" refers to Supreme Court precedent that held that the prosecution has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant, either because the evidence is exculpatory or because it can serve to impeach a key prosecution witness. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1967). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Now false testimony, of course, may *itself* amount to or contribute to a *Brady* violation in the case in which it is given. MCPO had a larger *Brady/Giglio* concern, however. The fact that Del Turco had testified falsely was, in itself, a fact that the prosecution would be obligated to disclose in any other case that depended on the credibility of Del Turco.

to *fail* to take steps to ensure disclosure—as the plaintiff appears to be suggesting—would itself constitute wrongdoing of constitutional dimension.

For the reasons explained herein, I will grant defendants' motions to dismiss (DE 50, 56) as to the federal claims; I will decline to exercise supplemental jurisdiction over the state claims; and I will remand this case to the state court from which it originated. Mr. Del Turco's accusations of scapegoating, violation of civil service protections, and ulterior prosecutorial motives may or may not support a state-law cause of action, a question I will leave to the state courts.

## I.  Summary[2]

### A. Factual Background[3]

Mr. Del Turco was a patrolman employed by the Randolph Township Police Department ("Randolph PD"). (2AC ¶ 14)

The "factual background" portion of the 2AC (*see id.* at p. 3–5) is vague about the impetus for Mr. Del Turco's resignation from the Randolph PD. Counts 10–12 clarify that Del Turco's resignation stemmed from testimony he gave in the grand jury and at a suppression hearing concerning a motor vehicle stop that occurred on March 24, 2017. (*Id.* ¶ 13, p. 10–19; *see also* DE 58-4 (Video of Proffer Session) ("Exhibit D"))

The 2AC asserts, though not very clearly, that the motor vehicle stop unfolded as follows. Randolph PD notified MCPO that a confidential informant was assisting with a narcotics investigation that was targeting an individual,

---

[2]  Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"2AC" = The second amended complaint filed by Mr. Del Turco (DE 49).

[3]  The facts presented in this section are accepted as true for purposes of the motions to dismiss. I summarize those facts presented in the "factual background" portion of the 2AC as well as those facts that were additionally alleged under Counts 10 through 12, but which were not otherwise included under the "factual background" section of the 2AC.

"D.W.", who was attempting to purchase heroin. (*Id.* ¶¶ 57–59) Mr. Del Turco was assigned to follow D.W. after the controlled drug purchase and to conduct a motor vehicle stop. (*Id.* ¶ 59) An MCPO "special enforcement unit" provided two trail cars to conduct surveillance of the buy, and MCPO detectives were on the scene to observe. (*Id.* ¶¶ 60–64) The 2AC suggests that the traffic stop was conducted by Mr. Del Turco and reported as a DWI. Del Turco asserts that MCPO's special enforcement unit ordered that video recording monitoring be turned off during the traffic stop. (*id.* ¶ 65) He further alleges that Chief Assistant Prosecutor Seabury ordered an illegal strip search of D.W. (*Id.* ¶¶ 66–69)

After the motor vehicle stop, Chief AP Seabury allegedly attempted to cover up the illegality of the strip search and change the justification for prosecuting D.W. from a pre-planned narcotics stop to a DWI arrest. (*Id.* ¶¶ 70–74) MCPO ordered that no reports were to be generated from the narcotics investigation. As a result, MCPO's general investigation unit was unaware that a special enforcement unit was involved, or that this was anything other than a DWI. (*Id.* ¶¶ 75–78) In advance of Mr. Del Turco's grand jury testimony, the assistant prosecutor prepared him to testify as to the DWI case. (*Id.* ¶¶ 80–84) (The implication may be that this particular prosecutor did not know about the drug aspect of the case.) Mr. Del Turco apparently did not reveal the drug aspects of the case. He does not otherwise specify the precise nature of the falsehoods in his testimony. Mr. Del Turco testified about the DWI, in line with his police report. (*Id.* ¶ 84) He believed that the prosecutor had made a deliberate decision that he should withhold further information, and so he did so. (*Id.* ¶¶ 85–86)

On January 10, 2018, Mr. Del Turco again testified, this time at a suppression hearing before the Hon. Thomas J. Critchley of the Superior Court of New Jersey. (*Id.*) Here there is a major gap in the presentation. Mr. Del Turco's complaint alleges in conclusory fashion that his testimony was "not a *Brady* violation" but declines to state what the testimony consisted of or the

manner in which it was false. He states that his testimony was incorrectly characterized as a "*Brady* violation." Still, stating a legal conclusion about the testimony's status under *Brady* is not a substitute for stating factually what it consisted of—particularly where he admits that it was false, and acknowledges receipt of the transcript.

The Morris County defendants caused the issuance of two communications that the 2AC calls the "*Brady* Orders." These disclosed Del Turco's false testimony so that it could be disclosed to the defense in criminal cases pursuant to the government's *Brady* obligations. It seems that MCPO issued the first *Brady* Order on or about January 22, 2018. On March 1, 2018, Mr. Del Turco resigned as part of a non-prosecution agreement negotiated by his counsel. (*Id.* ¶¶ 96–98) On March 13, 2018, shortly after the resignation, MCPO issued a second, revised version of the *Brady* Order which stated that Del Turco had resigned. (*Id.* ¶¶ 16–18)

On April 23, 2018, Mr. Del Turco wrote to defendant David Stokoe, the Chief of Randolph PD. The *Brady* Orders, according to the letter, were "inaccurate." (*Id.* ¶ 19) The letter warned Chief Stokoe that for the Randolph Police Department to obey those orders would be unlawful. Here, it is fairly clear that Del Turco is invoking his state-law rights as a public employee; According to the 2AC, the letter stated that *Brady* disclosure of "information concerning Plaintiff's January 10, 2018 testimony and its effects on his future employment would constitute a violation of state law as it would disclose information related to Plaintiff's employment that is not subject to disclosure under the circumstances." (*Id.* ¶ 22) Chief Stokoe, through counsel, advised that he would abide by MCPO's *Brady* Orders. (*Id.* ¶ 24)

In early June 2018, Mr. Del Turco received an offer of employment from another police department within Morris County. (*Id.* ¶ 26) Del Turco alleges that MCPO and/or McNamara learned of this employment offer and sent that Chief of Police a letter with the intent of having the offer of employment

revoked. (*Id.* ¶ 27) On or about June 17, 2018, Mr. Del Turco's offer of employment was revoked. (*Id.* ¶ 28)

### B. Proffer Session Video, "Exhibit D"

Mr. Del Turco submits as part of his opposition to the Morris County Defendants' motion to dismiss a video recording of the March 1, 2018 proffer session that led to the non-prosecution agreement and his resignation. (Exhibit D) Because this proffer session is discussed in the 2AC (*see id.* ¶¶ 96–100), and the video is submitted by plaintiff himself, I will consider it. To be clear, I consider the video as a record of what was said, and as a summary of the basis on which the non-prosecution agreement was reached. I do not, for example, take as true the prosecutor's statements of historical fact.

Here is a summary of the video's contents:

Mr. Del Turco and his counsel, Amie Dicola, Esq., were present at the proffer session, as was Morris County Prosecutor John McNamara, Jr. Mr. McNamara began by explaining the rationale behind the decision by MCPO to offer a deal to Mr. Del Turco. MCPO had conducted an investigation and produced to Del Turco and his counsel some preliminary discovery. In particular, they had furnished to Mr. Del Turco a transcript of his testimony and some reports generated by the investigation.

McNamara then noted that it was Del Turco himself who reported that he had testified falsely at the suppression hearing. Because Del Turco had come forward voluntarily, the prosecutor's office was prepared to offer more lenient terms than it otherwise would have done. Nevertheless, McNamara's position was fairly firm in light of the fact that Del Turco's conduct had jeopardized pending MCPO cases.

Mr. McNamara stated that the investigation had revealed that Mr. Del Turco's decision to testify falsely was his own independent choice. Del Turco knew that the operation involved a confidential drug investigation. Del Turco was also told by his sergeant to tell the assistant prosecutor the truth about the drug investigation. Del Turco, McNamara said, nevertheless withheld that

6

information. According to Mr. McNamara, there was no reason to mislead the prosecutors, who are experienced in handling confidential drug investigations. Had they known the truth, they could have dealt with confidentiality concerns within the bounds of the rules of evidence. By failing to share this information with the prosecutor, Del Turco enabled his own false or misleading testimony.

Mr. McNamara informed Mr. Del Turco and his counsel that his office had to consider whether it was possible to continue to work with Del Turco in the future. Del Turco, he said, would not be a viable witness given that, to fulfill its *Brady/Giglio* in future cases, MCPO would have to reveal that he had testified falsely. Indeed, said McNamara, MCPO had already been forced to send letters to counsel disclosing this issue in other cases involving Del Turco. The case concerning "D.W." discussed in the 2AC (*see* 2AC ¶¶ 57–59), for example (referred to as the "Wolfe case"), was dismissed based on the false testimony of Del Turco. In another case, MCPO was forced to make a modified plea offer because of Del Turco's testimony. McNamara also informed Del Turco that Randolph had recently received a notice of tort claim from D.W. seeking civil redress.

Mr. McNamara noted that MCPO appreciated that Del Turco self-reported the false testimony. MCPO was also of the opinion that Del Turco's behavior could be attributed to poor judgment rather than malice. Therefore, McNamara offered Del Turco two options: remain an officer and face criminal charges, or, in the alternative, resign and the office would agree not to prosecute. The latter alternative, Mr. McNamara stated, would come at a cost to MCPO, which could be criticized for not charging Del Turco. MCPO, said McNamara, was not prepared to negotiate further; it was either one alternative or the other.

During the proffer session, Mr. McNamara made it clear that should Mr. Del Turco take the resignation alternative, MCPO would do two things. First, it would state in writing that they chose not to prosecute Mr. Del Turco as a matter of discretion. Second, it would amend the January *Brady* Order to state that Del Turco had resigned. The Order would not disclose the non-prosecution agreement as such.

Mr. Del Turco's counsel acknowledges at the proffer session that she had discussed the *Brady* Order with Del Turco. She confirmed with McNamara that the *Brady* Order could not be withdrawn. McNamara stated that it had already been sent to the Randolph Municipal Prosecutor and other prosecutors that had cases involving Del Turco. Del Turco's counsel then inquired as to whether the *Brady* Order would be publicly disclosed. McNamara confirmed that it would be necessary to disclose it to the defense in cases where Mr. Del Turco was involved. But should Del Turco take the resignation option, said McNamara, this would become a personnel issue that need not be further publicized. McNamara clarified, however, that if Mr. Del Turco chose to seek employment elsewhere, Randolph would be instructed to release the letter to any future employer as to which there was an obligation of disclosure.

### C. Procedural History

On July 30, 2018, Mr. Del Turco filed a complaint in the Superior Court of New Jersey, Morris County Vicinage. (DE 1-3) On October 30, 2018, MCPO removed the action to this federal court based on general references to the federal constitution (although the complaint did not explicitly assert a § 1983 claim). (DE 1)

Prior to defendants' answering or otherwise moving with respect to the complaint, on November 8, 2018, Mr. Del Turco filed an amended complaint. (DE 7)

On November 15, 2018, the Randolph PD moved to dismiss the amended complaint. (DE 8) On December 23, 2018, MCPO moved to dismiss the amended complaint. (DE 16) On January 10 and 22, 2019, Mr. Del Turco filed papers in opposition. (DE 24, 27) On March 11, 2019, I administratively terminated those motions to dismiss based on plaintiff's contention in his opposition to the Morris County Defendants' motion to dismiss (DE 24) that his true intent was to name as defendants Assistant Prosecutor ("AP") Seabury and County Prosecutor McNamara. (DE 36)

On April 10, 2019, plaintiff filed a motion to file a second amended complaint. (DE 37) With the authorization of the Magistrate Judge, defendants did not oppose the motion to amend. Instead, on June 28, 2019, Randolph PD, Mr. Stokoe, and the Township of Randolph filed a motion to dismiss the 2AC. (DE 50) On September 6, 2019, MCPO, John McNamara, Jr. and Bradford Seabury filed their motion to dismiss the 2AC. (DE 56) Mr. Del Turco has filed oppositions in response to those motions. (DE 54, 58)

The 2AC asserts twelve causes of action. Counts 1 through 9 are asserted against Chief Stokoe, Randolph PD, Township of Randolph, MCPO, and John McNamara, Jr.—*i.e.*, all defendants except for AP Seabury. Counts 1 through 5, 8, and 9, do not assert recognized federal causes of action; rather, they assert that a defendant's behavior has been "arbitrary, capricious and unreasonable." (2AC p. 6–9)

Counts 6 and 7, which are nearly identical, assert that "Defendant Stokoe's commitment, on behalf of Defendants Township of Randolph and Randolph Township Police Department, to abide by the *Brady* Orders, as memorialized by his April 27, 2018 correspondence, constitutes discipline imposed, without due process, outside of the formal disciplinary process, in contravention of" various sources of rights:

- Rights under Title 40A of the New Jersey Attorney General's Guidelines;
- Due process rights;
- Administrative due process rights;
- First Amendment rights;
- Fourteenth Amendment rights;
- Liberty interests;
- Property interests;
- Other fundamental rights guaranteed by the U.S. Constitution, the New Jersey Constitution, and Title 40A of the New Jersey Attorney General's Guidelines.

(*See* 2AC ¶¶ 45–50)

On February 11, 2020, I held oral argument. Mr. Del Turco's counsel stated that Counts 1 through 9, despite their wording, are intended to assert violations of federal substantive and procedural due process rights.[4]

The relief requested in Counts 1–9 is declaratory and injunctive. "Plaintiff demands a departmental hearing pursuant to Title 40A, the New Jersey Attorney General's Guidelines, and the Randolph Township Police Department's policies, rules, regulations, general orders, and collective bargaining agreements." (*Id* ¶ 50) Mr. Del Turco also seeks judgment in the form of being provided with copies of the *Brady* Orders, enjoining defendants from further abiding by the *Brady* Orders, compelling defendants to revoke the *Brady* Orders, destruction of the *Brady* Orders, and a declaration that compliance with the *Brady* Orders would constitute violations of Attorney General guidelines and N.J. Stat. Ann. Title 40A. (*Id.* p. 9–10)

The 2AC then asserts three more causes of action against the Morris County Defendants. Those counts are:

- Count Ten:  Fraud and Breach of Fiduciary Duty asserted against MCPO and Chief Assistant Prosecutor Seabury;
- Count Eleven:  Fraud and Fraud in the Inducement asserted against MCPO and John McNamara, Jr.; and
- Count Twelve:  Tortious Interference with Contractual Relations asserted against MCPO and John McNamara, Jr.

These three Counts seek damages, attorney's fees, and costs.

## II.    Legal Standard

### A. Motion to Dismiss

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science*

---

[4]    Here, the complaint perhaps betrays its state-court origins. These counts most resemble a state-law action in lieu of prerogative writs. *See* N.J. Ct. R. 4:69-1. For purposes of this motion, I will indulge *arguendo* counsel's representation that they are now intended to assert federal due process claims, despite the lack of any such language.

*Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

### B. Extrinsic documents

Plaintiff's brief in opposition to the Morris County Defendants' motion to dismiss (DE 58) attaches a video of a March 2018 proffer session. ("Exhibit D", DE 58–4) This video pertains to the non-prosecution agreement and decision to resign from the Randolph PD that is discussed throughout the 2AC. Its contents are described in Section I.B, *supra*.

Typically, when a federal court relies on matter outside of the pleadings, it must convert a motion to dismiss into a motion for summary judgment

pursuant to Rule 56, Fed. R. Civ. P. In announcing its intention to do so, the court will then provide all parties with a reasonable opportunity to present all material pertinent to a Rule 56 motion. *See* Fed. R. Civ. P. 12(d). That procedure allows every party a fair opportunity to respond to any extrinsic documents that the court considers. *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A court may, however, without converting the motion to one for summary judgment, consider documents to which a plaintiff refers in the complaint or upon which its claims are based. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997); *Pension Benefit*, 998 F.2d at 1196. In such a case, a party "obviously is on notice of the contents of the document, and the need for a chance to refute evidence in greatly diminished." *Pension Benefit*, 998 F.2d 1192 at 1196–97.

Here, the 2AC refers to the proffer session. Del Turco's claims arise in substantial part from this proffer session, which produced the non-prosecution agreement and his resignation. And of course it is plaintiff, not defendant, who submitted the video to the court. I will consider it, not for the truth of any declarant's statements, but for the issue of what was said at the meeting.

### III.  Counts One through Nine

The Randolph Defendants, MCPO, and Mr. McNamara move to dismiss Counts 1 through 9 under Rules 12(b)(6) and 12(b)(1). Only Counts 6 and 7 mention the federal constitution; at oral argument, however, counsel stated that Counts 1 through 9 should all be read as asserting violations of Mr. Del Turco's procedural and substantive due process rights. For purposes of argument, I will liberally read all of Counts 1 through 9 to allege violations of 42 U.S.C. § 1983.

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005). The

2AC fails to state a federal claim against the Randolph Defendants, MCPO, and Mr. McNamara. For the reasons stated below, the motions to dismiss are granted.

### A. Procedural Due Process

The 2AC alleges that the disciplinary proceedings (or lack thereof), the distribution of the *Brady* Orders, and defendants' abiding by those Orders violated Mr. Del Turco's right to due process. In general, a procedural due process claim requires plaintiff to allege that: (1) "he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property'"; and (2) "the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

The individual interests at stake appear to be Mr. Del Turco's continued employment and his reputational interests. The alleged deprivation of due process appears to be the failure to adhere to the processes for firing a public employee prescribed by N.J. Stat. Ann. Title 40A.

### 1. Randolph Defendants

As to the Randolph Defendants—Randolph PD, Randolph Township and Chief Stokoe—I find that no procedural due process violation has been alleged.

The 2AC seeks to have the *Brady* Orders nullified and to enjoin the Randolph Defendants from complying with them. (2AC ¶¶ 16–18) However, as the 2AC makes clear, those Orders were issued by MCPO. (*Id.*) County Prosecutors like MCPO "have broad supervisory authority over the operations of municipal police departments." *Tompkins v. Thomson*, No. A-3676-14T1, 2017 WL 2730256, at *5 (N.J. Super. Ct. App. Div. June 26, 2017) (citing *Cherrits v. Village of Ridgewood*, 311 N.J. Super. 517, 532 (N.J. Super. Ct. App. Div. 1998)). The New Jersey Supreme Court has explained:

> It is a matter of common knowledge that the local law enforcement authorities ... are responsive to the county prosecutor's concept of law enforcement on pain of possible indictment if they do not

> cooperate with him in enforcing the law. He does not stand alone.
> He is in a position to command the cooperation of all the law
> enforcing authorities in the county.

*State v. Winne*, 12 N.J. 152, 169, 96 A.2d 63 (1953); *see also* N.J. Stat. Ann. § 2A:158–5 (stating that each county prosecutor is vested with the same powers, within the county, as the attorney general); N.J. Stat. Ann. § 52:17B–112(b) ("It shall be the duty of the police officers of the several counties and municipalities … to cooperate with and aid … the several county prosecutors in the performance of [their duties].").

Mr. Del Turco asserts that the *Brady* Orders were "unlawful" because his testimony did not constitute a *Brady* violation. (DE 54 at 9) That is a legal conclusion, not a fact. He does not dispute that his testimony was false (although he blames the prosecutors for it). And indeed it might be a *Brady* violation for the prosecution to *fail* to disclose that an officer involved in a case had testified falsely.

At any rate, in light of MCPO's broad supervisory powers, it is unclear what process was denied by the Randolph Defendants. By Mr. Del Turco's own admission, he self-reported that he had testified falsely (*see* Exhibit D), thereby setting in motion the distribution of the *Brady* Orders and the negotiation of his resignation in return for nonprosecution. MCPO, not Randolph, conducted an investigation into Mr. Del Turco's behavior. The *Brady* Orders were issued by MCPO, not Randolph. MCPO, not Randolph, negotiated the terms of Del Turco's resignation. And, as discussed more fully below, Mr. Del Turco resigned pursuant to a non-prosecution agreement negotiated by his counsel with MCPO. (*Id.*) None of this involved the Randolph Defendants or any disciplinary actions taken by the Randolph Defendants. Del Turco has failed to allege any manner in which the Randolph Defendants denied him due process in connection with the termination of his employment *via* voluntary resignation.

Nor is there anything procedurally defective about the Randolph defendants' compliance with the *Brady* Orders from MCPO. There is no

demonstration that MCPO lacked the authority to issue them.[5] I will not tarry over the notion that the prosecution should be barred from disclosing in criminal cases that a police witness has lied under oath. Perjury is quintessential *Giglio* material, and such disclosure is a constitutional obligation. Even if there had been a violation of Mr. Del Turco's procedural rights, that *Brady/Giglio* obligation would be unaffected.

I find that Mr. Del Turco has failed to assert that the Randolph Defendants violated his procedural due process rights. I will dismiss Counts 1 through 9 against the Randolph Defendants insofar as they assert procedural due process violations.

### 2. Morris County Defendants

The real targets of Counts 1 through 9 appear to be the Morris County Defendants—MCPO and McNamara—who caused the *Brady* Orders to be issued. The 2AC fails to point to any deficiency in the procedure by which the *Brady* Orders were generated (he sometimes refers to this process as being put on a "*Brady* list"). Nor does it identify any deficiency in the procedure by which the non-prosecution agreement and resignation were negotiated, in his presence, through his counsel. (DE 56-3 at 36–37)

As for the *Brady* Orders, no procedural due process violation appears on the face of the 2AC. To start, Mr. Del Turco self-reported that he had been untruthful. MCPO then conducted an investigation and met with Del Turco, who was given the opportunity to be heard, through counsel. (*See* Exhibit D.) At this meeting, Del Turco, through counsel, had the opportunity to discuss the *Brady* Orders and, in fact did so—the January 2018 *Brady* letter was a focus of the March 1, 2018 proffer session. (*Id.*) The parties then discussed that the Order (sometimes referred to as a letter) which had been distributed to in

---

5    The main authority cited, *Schmidt v. United States*, 145 Ct. Cl. 632 (1959), is an old Court of Claims case involving a claim of employee insubordination. It has nothing to do with whether a police department may disregard the County Prosecutor's position on a *Brady* disclosure issue.

jurisdictions where the prosecutor's office was obligated to turn over *Brady/Giglio* materials. (*Id.*) Del Turco was also advised that, should he resign, a revised letter would be issued reflecting the resignation. (*Id.*) Del Turco's counsel asked additional questions about these letters; explained that she had discussed the issue of the letters with her client; asked if they could be revoked (McNamara stated that they could not be); discussed with prosecutor McNamara the revision of the letters should Mr. Del Turco resign; and obtained a commitment that the letters would not be publicly disseminated. (*Id.*) In short, Del Turco, with counsel, was given an opportunity to confront these letters and dispute their accuracy. At the time, McNamara informed Del Turco and his counsel that MCPO had authorized the Randolph defendants to disclose the letters should Mr. Del Turco seek future employment in a context where *Brady* disclosure of the false testimony would be required. (*Id.*) Del Turco agreed to resign, voluntarily relinquishing his employment status. Under these circumstances, I do not find a violation of Mr. Del Turco's due process rights.

Mr. Del Turco claims that he was terminated without due process in that he was not "afforded all of the protections of Title 40A. Pursuant to N.J.S.A. 40A:14-147 a municipal police officer cannot be terminated without just cause." (DE 54 at 8)

N.J. Stat. Ann § 40A:14-147 provides that

> no permanent member or officer of the police department or force shall be removed from his office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established for the government of the police department and force, nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment, or position therein, except for just cause as hereinbefore provided and then only upon a written complaint setting forth the charge or charges against such member or office. The complaint shall be filed in the office of the body, officer or officers having charge of the department or force wherein the complaint is made and a copy shall be served upon the member or officer so charged, with notice of a designated hearing thereon by the proper authorities, which shall be not less than 10 nor more than 30 days from date of service of the complaint.

Accordingly, should an officer be removed for cause, that officer has the right to understand the charges leveled against him and afforded a hearing.

Here, by contrast, Mr. Del Turco resigned. Of course, he could have elected to stand and fight. If so, he presumably could have availed himself of the Title 40A procedures, to the extent they applied, to fight his dismissal. But he didn't; to avoid prosecution, he resigned. He relinquished the alleged property right in continued employment that is the foundation of his due process claim. Having taken the second option and avoided criminal prosecution, he now seeks to go back and claim the benefits of the first option as well.

Where, as here, an employee resigns or retires from his or her position, I must presume such conduct to be voluntary. *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999) (citing *Angarita v. St. Louis Cty.*, 981 F.2d 1537, 1544 (8th Cir. 1992)). "This presumption remains intact until the employee presents evidence to establish that the resignation or retirement was involuntarily procured." *Id.* The Third Circuit has stated that there are two circumstances under which an employee's resignation or retirement will be deemed involuntary for purposes of due process claims: (1) "when the employer forces the resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee." *Id.* at 228. Such circumstances are not alleged here.

Plaintiff suggests that his resignation from the Randolph PD was somehow involuntary because he faced an "impossible" choice and his resignation was induced by "false and/or misleading statements of material fact and/or material omissions related to the true intent of Defendants Morris County Prosecutor's Office and/or John McNamara, Jr. to effectively bar Plaintiff from ever obtaining employment in law enforcement again." (2AC ¶ 98) Notwithstanding that Mr. Del Turco has amended his complaint twice, he has not offered any evidence, or even any concrete factual allegation, to support his

contention that his resignation was involuntary. Exhibit D, moreover—submitted by him—establishes the opposite. After a meeting at which he was represented by counsel, he chose to resign rather than face criminal charges. And no misstatement of material fact as to the prosecutors' intentions appears; they told him they would reveal the *Brady* Order to a new employer as appropriate.

That Mr. Del Turco faced an unappetizing set of choices does not convert his resignation from a voluntary one to an involuntary one:

> [T]hat the choice is between comparably unpleasant alternatives—e.g., resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary. *Id.* This is so even where the only alternative to resignation is facing possible termination for cause, unless the employer actually lacked good cause to believe that grounds for termination existed. *Id.* at 587–88 ("The fact remains, plaintiff had a choice. She could stand pat and fight") (emphasis in original); *see also Pitt v. United States*, 420 F.2d 1028, 190 Ct. Cl. 506 (1970) (resignation not involuntary where alternative was criminal charges); *Cosby v. United States*, 417 F.2d 1345, 189 Ct. Cl. 528 (1969) (same; charges of gross insubordination); *Autera v. United States*, 389 F.2d 815, 182 Ct. Cl. 495 (1968) (same; charges of incompetence); *but see Schultz*, 810 F.2d at 1136–37 (resignation involuntary where induced by threat of termination where employer lacked good faith basis for believing that cause existed).

*Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 174–75 (4th Cir. 1988); *see also Boody v. Twp. of Cherry Hill*, 997 F. Supp. 562, 571 (D.N.J. 1997) ("The mere fact that plaintiff was faced with a choice between comparably unpleasant alternatives—e.g., resignation or facing criminal charges—does not establish that his resignation was involuntary." (citations omitted)).

In *Boody*, for example, a Cherry Hill police officer resigned from his position after becoming implicated in a retaliatory series of events against another officer. 997 F. Supp. at 565. The police department began an investigation and, on the advice of his counsel, plaintiff resigned. *Id.* at 566. As

part of his resignation agreement, plaintiff agreed to testify truthfully before a grand jury in exchange for not being subject to criminal prosecution. *Id.* The plaintiff then filed suit alleging, *inter alia*, a Section 1983 claim that his Fourteenth Amendment rights were violated because his resignation was involuntary. The Court disagreed, finding no violation of plaintiff's Constitutional rights:

> There is no dispute that plaintiff's involvement in the Zanetich incident, which plaintiff has admitted, precipitated an investigation of his conduct by both the Police Department and the Prosecutor's Office and eventually led to plaintiff's resignation. During the course of these investigations and leading up to his resignation, plaintiff was represented by counsel, who negotiated with the Prosecutor's Office and the Police Department the circumstances under which plaintiff would tender his resignation. Under the agreement ultimately reached, plaintiff would resign from the Police Department and testify before the grand jury investigating the Zanetich incident; in exchange, the Prosecutor's Office would not bring criminal charges against him. Pursuant to this agreement and on the advice of his attorney, plaintiff resigned on May 11, 1995. He later testified before the grand jury, though he himself was never charged with any crimes.

*Boody*, 997 F. Supp. at 570.

Under these cases, I cannot find that Mr. Del Turco's resignation was involuntary in the sense of being tendered as a result of duress or deception. The *Boody* facts read directly onto this case. Like the officer in *Boody,* Del Turco had the option to stay and fight dismissal (or criminal charges), but came to see resignation as the more prudent course. As in *Boody,* the misconduct was admitted. Like *Boody*, Del Turco retained counsel. (*See* Ex. D.) Del Turco and his counsel met with MCPO to discuss a resolution. The cards were on the table. The prosecution clearly stated that it would not withdraw the *Brady* Order disclosing Del Turco's false testimony, but would amend it to indicate that he had resigned. Ultimately, Del Turco, like the officer in *Boody,* "on the advice of his attorney, [] chose to resign, and thus relinquished his right to continued employment and any procedural protections that go with it." 997 F. Supp at 571.

Accordingly, I hold that the 2AC fails to state a federal procedural due process violation against MCPO and McNamara.

### B. Substantive Due Process

A related claim, also said to lurk in Counts 1 through 9, is that the defendants violated Mr. Del Turco's substantive due process rights. Those claims, too, fail.

The Due Process Clause not only requires that the government follow appropriate procedures when it seeks to "deprive any person of life, liberty or property"; it also prevents "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Thus, the Due Process Clause has a substantive component which guarantees that "all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States." *Planned Parenthood of Southeastern Pennsylvania*, 505 U.S. 833, 847 (1992) (quoting *Whitney v. California*, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring)). "To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392, 400-02 (3d Cir. 2003)).

Mr. Del Turco asserts that he has a protectable property interest in continued public employment (DE 54 at 8). He also states that he has a liberty interest in his reputation as a result of the issuance of these *Brady* Orders and Randolph's compliance with them. (*See* DE 54 at 8 ("Plaintiff's reputation suffered from the false allegation that he had committed a *Brady* violation."))[6]

---

6    Here, as elsewhere, this description has given rise to some confusion. It is true, of course, that the perjury may have *itself* created a non-disclosure that amounted or contributed to a *Brady* violation in the D.W. case. But because Del Turco had knowingly testified falsely, that fact itself was *Brady* material that the prosecution would be obligated to disclose in any future case involving Del Turco.

The analysis regarding Mr. Del Turco's substantive due process allegations is largely the same as to the Randolph Defendants and Morris County Defendants, so I merge the discussion.

## 1. Continued Employment

Mr. Del Turco contends that because he was a municipal police officer, he had a right to continued public employment and should have been afforded all the protections of Title 40A by the Randolph and Morris County Defendants. (DE 54 at 8; DE 58 at 15–17) I disagree:

> To prevail on a substantive due process claim that challenges non-legislative state action, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139-40 (3d Cir. 2000) (Alito, J.). "Whether a property interest is protected for purposes of substantive due process is a question that is not answered by reference to state law. Rather ... [the property interest] must be 'fundamental' under the United States Constitution." *Hill*, 455 F.3d at 234 n.12 (citing *Nicholas*, 227 F.3d at 140). If the interest is not "fundamental," the governmental action is entirely outside the ambit of substantive process and will be upheld so long as the state satisfies the requirements of procedural due process. *Nicholas*, 227 F.3d at 142.
>
> . . .
>
> In *Nicholas*, the Third Circuit found that employment rights are not entitled to substantive due process protection, noting that it views "public employment as more closely analogous to those state-created property interests that this Court has [previously] deemed unworthy of substantive due process." *Nicholas*, 227 F.3d at 143. This approach to employment rights in the area of substantive due process is in accord with that taken by the majority of the circuits. *See Pence*, 2010 WL 2925901, at *9 (collecting cases).

*Falco v. Zimmer*, No. CV 13-1648, 2015 WL 7069653, at *6 (D.N.J. Nov. 12, 2015), *aff'd*, 767 F. App'x 288 (3d Cir. 2019). Here, as *Nicholas* outlines, Mr. Del Turco did not have a Constitutionally protected right to continued public employment. In addition, he voluntarily relinquished that employment as the *quid* in exchange for the *quo* of non-prosecution. Nor does the substantive component of due process incorporate a public employee's rights under Title

40A of the New Jersey Statutes. Accordingly, Del Turco has not alleged, nor can he allege, a substantive due process violation based on the loss of his employment with Randolph PD.

In any event, it cannot be said that Mr. Del Turco's separation from the Randolph PD, irrespective of the procedures, "shocks the conscience." That standard encompasses "'only the most egregious official conduct.'" *United Artists*, 316 F.3d at 400. New Jersey prosecutors and police departments have a strong interest in assuring that police officers faithfully carry out their duties and testify truthfully. Here, as Mr. Del Turco concedes, he testified untruthfully. He says he did so because he concluded that the prosecution wanted him to do so, but that is hardly the point. The allegations presented in the 2AC, in light of this admission, do not plausibly establish that the government's negotiation of Mr. Del Turco's resignation, through his counsel, "shocks the conscience," or was arbitrary or wanton.

## 2. Reputational Harm

Mr. Del Turco also asserts that he has a protectable liberty interest in his reputation that was violated by the dissemination of the *Brady* Orders.

"[R]eputation alone is not an interest protected by the due process clause" of the Fourteenth Amendment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (quoted case and internal quotation marks omitted). Instead, the Due Process Clause protects a liberty interest in reputation only when the plaintiff shows a "stigma" to reputation "plus deprivation of some additional right or interest." *Id.* Under this "stigma-plus" test, when a public employer " 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' "due process applies and the employee is entitled to a "name-clearing hearing." *Id.* (quoted case omitted). The "stigma" is the "creation and dissemination of a false and defamatory impression," and "the termination is the 'plus.'" *Id.* A plaintiff satisfies the stigma prong of this test by showing that the allegedly stigmatizing statements were made publicly and were false. "For government action to infringe the

22

'reputation, honor, or integrity" of an individual, that government action first must involve a publication that is substantially and materially false.'" *Ersek v. Twp. of Springfield*, 102 F.3d 79, 83–84 (3d Cir. 1996) (citing *Codd v. Velger*, 429 U.S. 624, 627–29, 97 S. Ct. 882, 883–85 (1977)).

Here, the "stigma" inquiry fails. It is hard to see what the alleged "falsehood" might consist of. Plaintiff himself reported that he testified falsely at the suppression hearing. He merely seeks to justify that behavior by blaming the prosecutor. The *Brady* Orders were issued, in compliance with MCPO's *Brady/Giglio* obligations, to alert affected parties of a potential issue with Mr. Del Turco's involvement in their matters. Thus, viewing Exhibit D and the 2AC as a whole, Mr. Del Turco has failed to establish that the statements in the *Brady* Orders were false or that the dissemination of them was wrongful.

Accordingly, defendants' motions to dismiss Mr. Del Turco's substantive due process claims are granted.

## IV.    State Law Claims

Counts 1-9 of the 2AC and its predecessors, although they fail to state a federal claim, are most naturally read as state-law claims. The complaint was removed from state court by the defendants based on its citation of provisions of the U.S. Constitution in some of the laundry-list allegations of Counts 6 and 7. (*See* DE 1-1 (Notice of removal); DE 1-3 (Original complaint)).[7] Counts 10-12, of course, are pure state-law claims, with no federal-law component. Having

---

[7]    The language of Count 6, for example, is as follows:

[Certain alleged action] constitutes discipline imposed, without due process, outside of the formal disciplinary process, in contravention of Officer Del Turco's rights, pursuant to Title 40A, the New Jersey Attorney General's Guidelines; his due process rights; his administrative due process rights; his 4th Amendment rights; his liberty interests; his property interests; and, other fundamental rights guaranteed the by the Constitution of the State of New Jersey, and the Constitution of the United States of America; and, as such, such discipline is arbitrary, capricious, and, unreasonable.

(DE 1-3 at 9)

dismissed all federal claims, I decline to exercise supplemental jurisdiction over the state law claims that remain. *See* 28 U.S.C. § 1367.

Counts 1–9, as I extracted from plaintiff's counsel at oral argument, were actually drafted with a state-court action in lieu of prerogative writs in mind. *See* N.J. Ct. R. 4:69-1. These counts allege, not constitutional deprivations, but "arbitrary" actions by officials in connection with the termination of the plaintiff's employment. They cite, *inter alia,* the procedural protections of N.J. Stat. Ann. Title 40A.

Counts 10 through 12 are pure state-law claims asserted against MCPO, Seabury, and McNamara. *See* Count 10 (Fraud and Breach of Fiduciary Duty); Count 11 (Fraud and Fraud in the Inducement); and Count 12 (Tortious Interference with Contractual Relations and/or Prospective Economic Advantage).

Under 28 U.S.C. § 1367(c), the Court has discretion to decline jurisdiction over remaining state-law claims after all federal claims have been dismissed from the action. The Third Circuit has held that where the federal claims that gave the basis for original jurisdiction are dismissed, a "district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco,* 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir. 1995)); *see Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.,* 730 F.2d 910, 912 (3d Cir. 1984) (holding that "pendent jurisdiction should be declined where the federal claims are no longer viable, absent extraordinary circumstances"). In short, the presumptive rule is that the state claims shall be dismissed, unless reasons of economy and fairness dictate otherwise.

Of course, where the case has been substantially litigated, it may be a proper exercise of discretion to retain it. *See Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.2d 1277, 1284–85 (3d Cir. 1993) (remanding for exercise of discretion as to whether to retain pendent claim, noting that where the district

court already heard all evidence necessary to decide the state contract claim, it might retain jurisdiction). Where, on the other hand, the case is nowhere close to trial, remand is the proper course. *Freund v. Florio*, 795 F. Supp. 702, 710 (D.N.J. 1992) ("[A]t this early stage in the litigation, dismissal of the pendent state claims in a federal forum will result in neither a waste of judicial resources nor prejudice to the parties.").

This case is in the early pleading stages. The federal claims are not substantial (and indeed may never have truly been intended as federal claims at all). No substantial considerations of fairness or economy weigh in favor of retaining jurisdiction. I will therefore exercise my discretion to decline the exercise of supplemental jurisdiction over all remaining state-law claims.[8]

## V.    Conclusion

I have dismissed Counts 1–9 for failure to state a federal constitutional claim. The complaint has been amended twice, the second time in response to defendants' arguments on a prior motion to dismiss. It appears that further amendment may be futile. Still, in an abundance of caution, I will enter the dismissal of federal claims without prejudice to the submission, within 14 days, of a properly supported motion to again amend the complaint. Any

---

[8]    Because this Court lacks jurisdiction over Counts 10–12, I do not reach certain issues asserted by the defendants. Defendants argue first that the plaintiff failed to file the required pre-suit notice under the New Jersey Tort Claims Act or the New Jersey Contractual Liability Act. N.J. Stat. Ann. 59:8, 59:13. As a result, they say, neither this court nor any state court would possess subject matter jurisdiction. Defendants also argue that these counts fail to state a claim, and that the Morris County Defendants are immune.

Having determine that I lack subject matter jurisdiction, I will not delve any further into other issues, whether jurisdictional or substantive. *See generally Willy v. Coastal Corp.* 503 U.S. 131, 137, 112 S. Ct. 1076, 1080 (1992) ("A final determination of lack of subject-matter jurisdiction of a case in a federal court, of course, precludes further adjudication of it."); *Orthopedic Bone Screw Products Liability Litigation v. Eyster*, 132 F.3d 152, 155 (3d Cir. 1997)("If a court then determines that it lacks subject matter jurisdiction, it cannot decide the case on the merits. It has no authority to do so.").

amended version will be scrutinized closely, not indulgently, for the existence of a federal claim.

I have dismissed all remaining state-law claims, including Counts 10–12, for lack of subject matter jurisdiction. Rather than dismiss the state law claims outright, however, I will exercise my discretion to remand this removed action to state court, where it was filed. There, if appropriate, the plaintiff may pursue whatever remains of his state law claims. The remand shall be held in abeyance, however, for 14 days, to accommodate any potential motion to amend. An appropriate order follows.

Dated: March 2, 2020

**Kevin McNulty**
**United States District Judge**